UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:16-CV-00143-TBR

SHERRIE GRIFFEY, PLAINTIFF

v.

WILLIAM ADAMS, II, et al., DEFENDANTS

**Memorandum Opinion & Order**

This matter comes before the Court upon Motion by Plaintiff Sherrie Griffey, ("Griffey"), to exclude a proposed expert witness, Dr. John Grady, pursuant to Federal Rule of Evidence 702. [DN 52.] This matter is ripe for adjudication and, for the reasons that follow, **IT IS HEREBY ORDERED** that Griffey's Motion [DN 52] is **DENIED**.

**A. Background**

**1. Factual & Procedural Background**

This case arises out of the former patient-doctor relationship between Griffey and one of Defendants, Dr. William Adams, ("Adams"), a doctor of podiatric medicine who focuses on foot and ankle problems and is board certified in foot and ankle surgery. The following quoted section is taken from this Court's previous Memorandum Opinion, Docket No. 59:

> Griffey suffered from pain in her left foot, an ailment for which she sought treatment from Adams. [DN 1, at 1-2.] Throughout the course of their doctor-patient relationship, "Griffey had had previous treatments for her left foot paint with Adams including stretching, icing, shoe changes, inserts and two corticosteroid injections…, all with no improvement…." [*Id.* at 2.] Thereafter, on August 31, 2015, Adams instructed Griffey that she suffered from "chronic plantar fasciitis, left and large infracalcaneal heel spur," and discussed the option of surgical intervention with her. [*Id.*] Griffey decided to proceed with the surgery, which took place at [Defendant] Lourdes [Ambulatory Surgery Center, LLC] on September 15, 2015. [*Id.* at 2-3.] Adams conducted the surgery. [*Id.* at 3.]

> Griffey's pre-operation surgery order, electronically signed by Adams, provides "operative consent" concerning "plantar fascia release with heel spur resection-left foot." [DN 44-3, at 1.] Likewise, Lourdes's consent form, signed by Griffey, authorized Adams to perform "the following operation or procedure: plantar fascia release with heel spur resection left foot." [DN 44-4, at 1.] However, when Adams began the surgery at Lourdes at approximately 12:08 p.m., [DN 44-8, at 11 Day Dep., p. 16], "[a] tourniquet was placed about her *right* thigh." [DN 44-5, at 1 (Lourdes Procedure Note) (emphasis added).] Then, "[a]n ankle block was performed on the right extremity," and "[t]he right lower extremely was then prepped and draped in usual sterile fashion." [*Id.*] Thereafter, "[a] skin incision was started" on Griffey's right ankle, at which time the anesthesiologist present in the operating room "related that his chart said left [ankle.]" [*Id.*] "The nurse, [Dana Day, ("Day")], again checked the cart, and the chart did say left," and so Adams stitched up Griffey's right foot and commenced the correct operation on Griffey's left foot. [*Id.* at 1-2.]
>
> In her Complaint, Griffey alleges that, as a result of the operation and the erroneous incision made by Adams into her right foot, she was rendered immobile, as "both her left and right feet had surgical wounds and weight bearing restrictions." [DN 1, at 4.]

[DN 59, at 1-2.]

Subsequently, Griffey filed a motion for partial summary judgment on the issue of liability concerning both Adams and Lourdes for her claims of negligence, gross negligence, and battery against both of them. This Court held that liability for ordinary negligence and battery had been established with respect to both Defendants. Around that same time, Adams and Lourdes filed motions for partial summary judgment on the issue of gross negligence and, relatedly, the availability of punitive damages to Griffey. This Court held that Griffey's claim for gross negligence and punitive damages against Lourdes must be dismissed, but that a factual dispute remained concerning Adams. Thus, the remaining issues in this case pertain to damages (as well as apportionment issues related thereto) concerning Lourdes's and Adams's established liability for negligence and battery, as well as Griffey's remaining claim for gross negligence and punitive damages against Adams, on which a genuine dispute of material fact remains. Now,

Griffey has filed a Motion seeking to exclude the testimony of one of Defendants' expert witnesses, Dr. John Grady, ("Grady"), pursuant to Rule 702 of the Federal Rules of Evidence.

### 2. Dr. Grady's Background & Opinion

Grady is a doctor of podiatric medicine, who currently works as a clinical professor in the Department of Podiatric Surgery and Applied Biomechanics at the Rosalind Franklin University of Medicine and Science. [DN 36-2, at 1 (Grady Curriculum Vitae).] In addition to his current position, Grady's curriculum vitae indicates that he has held numerous teaching positions, both in the clinical area as well as the research area. [*Id.*] He has been the Director of the Podiatric Surgical Residency program for the VA Chicago Healthcare System since November 1987 and has been the Chairman of the Division of Podiatric Surgery at Little Company of Mary Hospital in Chicago since September 2001. [*Id.* at 1-2.] Grady received his Bachelor of Science from Loyola University Chicago in 1976, his D.P.M. from the Illinois College of Podiatric Medicine in 1980, and thereafter completed a surgical residency at the Youngstown Osteopathic Hospital in Youngstown, Ohio. [*Id.* at 5.] Grady also completed a fellowship in the area of peripheral vascular disease and plastic surgery at the Cleveland Clinic in 1982. [*Id.*]

In his expert witness disclosure, Grady stated that his opinion is as follows:

> [b]ased upon my education, training, background and experience, as set forth in the attached Curriculum Vitae, it is my opinion that Dr. Adams provided reasonably competent and appropriate care to Mrs. Griffey by proceeding to operate on her left (correct) foot, for which informed consent had been given, while she was still under the effects of anesthesia. Following the incision which had been made upon the right foot, it was medically reasonable to proceed to finish the procedure which had been planned and authorized, as opposed to allowing time for Mrs. Griffey to sufficiently awaken from anesthesia to discuss the situation and obtain informed consent a second time, thereby avoiding further exposure to anesthesia.

[DN 36-1 (Adams's Expert Witness Disclosure, Aug. 30, 2017).] In its expert witness disclosure, Lourdes incorporated Grady's opinion by reference. [DN 39, at 1 (Lourdes's Expert Witness

Disclosure, Sept. 5, 2017).] Griffey now argues that Grady's proffered testimony is (1) irrelevant, and (2) unreliable, and so should be excluded by the Court. The merits of Griffey's Motion are discussed below.

**B. Legal Standard**

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In the seminal case *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), "the Supreme Court 'established a general gatekeeping [or screening] obligation for trial courts' to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (quoting *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001)). In carrying out this function as gatekeeper, it is incumbent upon the trial court to determine whether the evidence proffered under Rule 702 "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Of the utmost importance is the question of "whether the reasoning or methodology underlying the testimony is sufficiently valid." *Id.* at 592-93. To be sure, the trial court's inquiry here is "a flexible one," and "[t]he focus…must be solely on principles and methodology, not on the conclusions they

generate." *Id.* at 594-95. A testifying expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

In essence, "*Daubert* attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009) (citing *Amorgianos v. Nat'l R. R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). And while "[t]here is no 'definitive checklist or test' for striking this balance…the Supreme Court in *Daubert* set forth a number of factors that typically 'bear on the inquiry.'" *Id.* at 177 (quoting *Daubert*, 509 U.S. at 593). These factors "include whether the theory or technique in question 'can be (and has been) tested,' whether it 'has been subjected to peer review and publication,' whether it has a 'known or potential rate of error,' and finally, whether the theory or technique enjoys general acceptance in the relevant scientific community." *Id.* (quoting *Daubert*, 509 U.S. at 594). Of course, "these factors are nonexhaustive and may not be pertinent in cases where the 'the relevant reliability concerns…focus upon personal knowledge or experience." *Kumho Tire*, 526 F.3d at 150.

The Sixth Circuit has further filled in the contours of the *Daubert* inquiry, identifying "red flags," such as "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best*, 563 F.3d at 177).

### C. Discussion

In the present case, Griffey asks the Court to exclude Grady's proffered opinions concerning the medical reasonableness of Adams's act of operating on her left (correct) foot after

5

having made an incision on the right (incorrect) foot while Griffey remained under anesthesia, rather than waking her up to inform her of what had happened and asking for informed consent a second time. To support her motion, Griffey argues the following: (1) Grady's opinion is irrelevant to the case because his opinion relates to the medical reasonableness of Adams's decisionmaking, which Griffey argues doesn't actually go to the key question of consent to operate; and (2) Grady's opinion, at any rate, is unreliable because of his lack of expertise in the area of anesthesiology.

Griffey's relevance argument must fail. Rule 702 requires, among other things, that the proffered opinion of an expert witness must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Relatedly, "[i]n *Daubert*, the Supreme Court emphasized that in addition to examining the reliability of the expert's testimony, the trial court must ensure that the proposed expert testimony is 'relevant to the task at hand.'" *Great N. Ins. Co. v. BMW of N. Am. LLC*, 84 F. Supp. 3d 630, 643 (S.D. Ohio 2015) (quoting *Daubert*, 509 U.S. at 580). Thus, the question must be asked "whether the reasoning or methodology properly can be applied to the facts in issue...so as to assist the trier of fact." *Id.* (citations omitted). In essence, "[t]he relevancy prong goes to whether the proposed testimony is probative of a material issue in the case." *Id.* (citing *Daubert*, 509 U.S. at 580).

Here, the Court finds that Grady's proffered testimony is probative of the material facts of this case. Griffey's primary concern regarding the substance of Grady's testimony is that, in her estimation, this case comes down not to the reasonableness of Adams's actions in failing to wake Griffey up before commencing the correct procedure, but rather, solely concerns the question of Adams committing a battery (or negligence, or gross negligence) by making an incision on Griffey's right foot without consent to do so. However, the issues in this case are not

so narrow as to render Grady's opinion irrelevant. Throughout the life of this case, Griffey has made multiple references to the fact that Adams did not wake Griffey up before performing the proper procedure, and has indicated unequivocally that he should have done so. Grady's opinion goes to the reasonableness of that decision. As there remains a genuine dispute of material fact concerning whether Adams may be liable for gross negligence and, relatedly, punitive damages, the Court finds Grady's opinion concerning Adams's actions in the operating room to be "relevant to the task at hand." *Daubert*, 509 U.S. at 580.

The next issue is a more complicated one, and concerns the reliability of Grady's opinions. The Supreme Court in "*Daubert* provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony. These factors include: 'testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001)). Importantly though, "[t]he test of reliability is 'flexible,' and the *Daubert* factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case." *Id.* (quoting *Kumho Tire*, 526 U.S. at 150). The Sixth Circuit has instructed "that the *Daubert* factors 'are not dispositive in every case' and should be applied only 'where they are reasonable measures of the reliability of expert testimony.'" *Id.* (quoting *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001)). Finally, an obvious but crucial distinction must be drawn between questions and arguments about an opinion's credibility and/or accuracy and that same opinion's reliability. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a

7

reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-30 (citations omitted).

At the outset, it must be determined precisely what Grady's opinion are; the summary of his opinion, laid out *supra*, is brief and specific: it is his opinion that "it was medically reasonable to proceed to finish the procedure which had been planned and authorized, as opposed to allowing time for Mrs. Griffey to sufficiently awaken from anesthesia to discuss the situation and obtain informed consent, thereby avoiding further exposure." [DN 36-1, at 1.] Thus, his opinion relates to the two narrow issues of (1) not obtaining informed consent for the left foot surgery a second time, and (2) the risks associated with a second exposure to general anesthesia. [*Id.*]

Griffey argues forcefully that Grady's opinion is unreliable because, as a podiatrist and surgeon, and not an anesthesiologist, Grady is simply unqualified to provide an expert opinion concerning these issues. In support of this, Griffey frames Grady's argument as one relating to the science of anesthesiology, and points out that Grady testified at his deposition that he is not trained in anesthesiology, does not lecture on the topic, has not published literature on the topic, and has never personally administered general anesthesia. In response, Adams points to a recent Sixth Circuit decision, *Dickenson v. Cardiac and Thoracic Surgery of E. Tennessee*, 388 F.3d 976 (6th Cir. 2004), arguing that *Dickenson* is analogous to this case and, accordingly, it should control this Court's decision here. The Court agrees.

In *Dickenson*, the Sixth Circuit was faced with a district court's exclusion of one of the plaintiff's proposed expert witnesses. *Id.* at 978. The underlying facts of the case are as follows: the plaintiff, as conservator of Sandra Robinson, brought suit against Cardiac and Thoracic Surgery of Eastern Tennessee and Dr. Robert Rosser relating to complications arising from

8

Robinson's heart bypass surgery on November 10, 1998. *Id.* at 977. The plaintiff claimed that Rosser, the pulmonologist called upon by Robinson's surgeon to provide her with post-operative respiratory care, removed Robinson's ventilation tube prematurely, thereby causing Robinson to suffer brain damage due to a lack of oxygen. *Id.* at 977-78. One of the plaintiff's proposed experts was Dr. Dudley Johnson, a cardio-thoracic surgeon. *Id.* The district court refused to allow Johnson "to testify regarding the medical services rendered by Dr. Rosser on the ground that Dr. Johnson's testimony was unreliable under the gatekeeping principles set forth in *Daubert*…and its progeny." *Id.* at 979. The district court explained that "Dr. Johnson's deposition testimony reveals that he is not competent to testify concerning the standard of care applicable to a pulmonologist at least as concerns extubation of a ventilation tube. Dr. Johnson, obviously, is a cardiac thoracic surgeon not a pulmonologist…." *Id.* The district court went on to note that Johnson "is not trained in pulmonology. He has never qualified as an expert witness in a suit against a pulmonologist," and "he knows very little about ventilating medical equipment or the settings to be used." *Id.* Johnson also testified that he had never published any literature on pulmonology, and could not name any articles he had read on the subject. *Id.* at 979-80.

In holding that the district court abused its discretion in excluding Johnson as an expert witness, the Sixth Circuit stated the following:

> [t]he district court appears to have relied most heavily upon its supposition that a 'purported expert must demonstrate a familiarity with accepted medical literature or published standards in these other areas of specialization in order for his testimony to be reliable in the sense contemplated by Federal Rule of Evidence 702.' This is an erroneous statement of the law…'[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of *experience*.' Fed. R. Evid. 702 advisory committee's note (2000 Amendments) (emphasis added); *see also Kumho Tire*, [526 U.S. at 156]…('[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.'); *Amorgianos*, [303 F.3d at 267]…("Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may go to the weight, not the admissibility of the expert's

testimony.')…*Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) ('There is no requirement that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness.')….

*Dickenson*, 388 F.3d at 980-81. Thus, it was not conclusive that, in his deposition, Johnson demonstrated a lack of knowledge concerning ventilating medical equipment or the setting in which to use such equipment. *Id.* at 981. The Sixth Circuit finished by noting that *Daubert*'s intent to exclude "junk science" from the courtroom would not be "served by excluding testimony such as Dr. Johnson's that is supported by extensive relevant experience. Such exclusion is rarely justified in cases involving medical experts as opposed to supposed experts in the area of product liability." *Id.* at 982 (citing Daniel W. Shuman, *Expertise in Law, Medicine, and Health Care*, 26 J. Health Pol. Pol'y & L. 267 (2001)).

With this controlling framework in mind, the Court will turn its attention to Grady and the similarities this case bears to *Dickenson*. Like Johnson, in this case Grady possesses vast amounts of experience in his area of expertise; for Johnson, cardio-thoracic surgery, for Grady, podiatric medicine and surgery. [*See* DN 36-2.] He has been a licensed doctor of podiatric medicine for approximately thirty-eight years, currently chairs the Division of Podiatric Surgery at Little Company of Mary Hospital, and is also a clinical professor in the Department of Podiatric Surgery and Applied Biomechanics at the Rosalind Franklin University of Medicine and Science. [*See id.*] And in his capacity as a doctor, Grady further testified that he *does* evaluate patients for anesthesia to determine what type of anesthesia to use, and in fact did so the day before he gave his deposition testimony on September 29, 2017. [DN 52-6, at 10 (Grady Dep., p. 19).] Grady explained that, in evaluating a patient to determine whether they would be a good candidate for general anesthesia, he looks at "[t]he health of the patient, the procedures [he is] going to perform, and the amount of postoperative pain the patient might have with each type

of anesthetic delivery." [*Id.* at 11 (Grady Dep., p. 19-20).] Like Johnson, Grady demonstrated in his deposition an extensive knowledge of surgery, Grady's background, of course, relating to foot and ankle surgery, while Johnson's was with respect to cardio-thoracic surgery.

Moreover, when asked about the portion of his report relating to the purported additional risks associated with exposing Griffey to anesthesia a second time, Grady had the following exchange with Griffey's attorney:

> Q: [Griffey's attorney]: You said that thereby avoiding further exposure to anesthesia. So is it your opinion that she would have been at risk to come out of anesthesia and then at a later date to go under anesthesia again?
>
> A: [Grady]: Sure.
>
> Q: And what was that risk to her?
>
> A: Well, there's multiple risks to that. Number one, you've scheduled it so the schedule itself is a problem because usually when you schedule surgery there is a follow-up course that you've planned out, too, and how you're going to stay off it [the foot] and who is going to take care of you and things like that. But then there is the risk of anesthetic, going back under is much more risky than just continuing on in anesthesia in my personal opinion. And redoing it where you start –
>
> Q: Number one, tell me what your experience is in that regard. Have you ever had a situation where you had an anesthesia problem in a situation like this?
>
> ***
>
> Q: All right, Well, I'm trying to understand what you're basing your opinion on that Ms. Griffey would have a risk of anesthesia if she were to undergo a second round of anesthesia at a different date. So my question to you is what did you use to base this opinion on that there would be further exposure, further risk if she was brought back out of anesthesia and at a later date put under [again]?
>
> A: And it says right here, in my experience, training, background, you know, those are the things I'm relying on. A little bit of this is common sense, too, in that, you know, there is plenty of anesthesia risks and it's when you're initializing anesthesia and when you're waking people up that you have the risks. So if you're going to put a whole other episode –

> Q: What are those risks? That's what I'm asking you.
>
> A: There's a lot of risk. You can get problems from intubation. You can have problems because of the intubation, irritation to your throat, things like that. It can be as serious as causing some permanent damage. You can have lung problems from the extra episode initiated. You can – there is aspiration maneuvers that happen when you remove the tube and when you put it in. And obviously by doing a second round of that you're doubling the exposure to those kind of complications.

[DN 53-1, at 21 (Grady Dep., pp. 66-69).]

Later in the exchange, Grady repeated that his opinion for this case is based upon his experience as a surgeon, that "you deal with anesthesia every day in surgery," and that, in his view, his proffered opinion does not specifically relate to anesthesia, but rather, is "[o]n what the podiatrist's decision is in this situation. That's what I'm giving my opinion on." [*Id.* (Grady Dep., pp. 80-81).] Grady then explained that one of the decisions a podiatrist would need to make when faced with a situation like the one Adams faced during Griffey's surgery was whether to perform the correct surgery or to wake her up to discuss, and then put her under anesthesia a second time at a later date. Grady also pointed to the added cost of a second round of anesthesia and the related hospital expenses, the double recovery time that would have ensued had Adams awakened Griffey, allowed the right foot to heal and then performed the correct operation later, and the extended period of time that Griffey would have generally been in pain, considering the bone spurs would not have been fixed had Adams awakened her and not performed the correct surgery at that time. [*See id.* (Grady Dep., pp. 82-87).]

In short, after reviewing Grady's curriculum vitae, his stated opinion, and his deposition testimony, among other filings in the docket, the Court finds that the Sixth Circuit's decision in *Dickenson* applies directly to the facts of this case and therefore controls this Court's decision. The Sixth Circuit in *Dickenson* explicitly referred to Johnson's "extensive relevant experience"

as a cardio-thoracic surgeon as the basis for his being properly included as an expert witness, *see Dickenson*, 388 F.3d at 982, much in the same way this Court finds that Grady's extensive relevant experience as a podiatrist with a great deal of foot and ankle surgical experience qualifies him as an expert for purposes of the opinion he seeks to give. In *Dickenson*, Johnson was not purporting to be a pulmonologist, nor did he feign some sort of expertise in the intricacies of pulmonologists' everyday responsibilities, or that he was especially familiar with relevant pulmonology-related literature. *See id.* at 980-81. Rather, as a cardio-thoracic surgeon, he had extensive experience in observing postoperative cardiac patients, seeing as he had managed hundreds of patients in the three years prior to his deposition who required ventilators, and he had general experience in operative and postoperative settings in the hospital environment where pulmonary issues were commonplace. *See id.* at 979-80.

Likewise, Grady was repeatedly clear in his deposition testimony that he is not an anesthesiologist, he does not administer general anesthesia, and he does not publish literature in that area. However, as a foot and ankle surgeon with almost forty years of experience, he has extensive experience in operating rooms where general anesthesia is commonly administered, and it is this experience upon which this Court rests its decision to include his testimony. The spirit of *Daubert* was and remains to prevent the inclusion of "junk science" in the courtroom setting, *see id.* at 982, and *Daubert*'s purposes would not be served here by excluding Grady's testimony. Accordingly, Griffey's Motion must be denied.

## D. Conclusion

For the reasons stated in this Memorandum Opinion, and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED** that Griffey's Motion, [DN 52], is **DENIED**.

**IT IS SO ORDERED**.

cc: Counsel of Record